IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

RICHARD MILLER,                              )          Civil Action No. 3:04-1635-PMD-JRM
                                             )
                    Plaintiff,               )
                                             )
          v.                                 )
                                             )
COMMISSIONER OF SOCIAL SECURITY, )          **REPORT AND RECOMMENDATION**
                                             )
                    Defendant.               )
_____            )

          This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C.,

concerning the disposition of Social Security cases in this District.  Plaintiff brought this action

pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner

of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

          On September 28, 2001, Plaintiff applied for DIB.  Plaintiff's application was denied

initially and on reconsideration, and he requested a hearing before an administrative law judge

("ALJ").  After a hearing held July 8, 2003, at which Plaintiff appeared and testified, the ALJ

issued a decision dated November 12, 2003, denying benefits.  The ALJ, after hearing the

testimony of a vocational expert ("VE"), concluded that work exists in the national economy

which Plaintiff can perform.

          Plaintiff was forty-six years old at the time of the ALJ's decision.  He has a high school

education and past relevant work as a customer service representative in a call center,

telemarketer, truck driver, insurance sales representative, exterminator, and sales manager.

Plaintiff alleges disability since December 2002,[1] due to cardiomyopathy, total right hip replacement, limited use of his left arm from a herniated disc, and limitation of motion of his right elbow.

The ALJ found (Tr. 22-23):

1.  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and has not engaged in substantial gainful activity since December 21, 2002, the amended date of disability onset.

2.  The medical evidence establishes the claimant's diagnosed cardiomyopathy with ventricular tachycardia and residuals of right total hip replacement are "severe" impairments as defined in the regulations, but not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

3.  The claimant has medical impairments that could reasonably cause some of his subjective symptoms; however, the evidence does not substantiate his allegations concerning the level of severity of physical limitations, pain, or functional restrictions. therefore, such allegations are less than fully credible.

4.  The claimant has retained the residual functional capacity to perform work with restrictions that require simple, routine work; a low stress, supervised environment; no interaction with the public or "team"-type interaction with co-workers; no lifting or carrying over 10 pounds; no standing and/or walking over 2 hours in an 8-hour workday; limited stooping, twisting, crouching, kneeling and climbing of stairs or ramps; no crawling or climbing of ladders or scaffolds; and an environment free from extremes of humidity and temperature.

5.  The claimant is unable to perform the requirements of his past relevant work.

---

[1]Plaintiff originally alleged an onset date of April 1, 2001.  Tr. 75.  At the hearing, he amended his onset date to December 21, 2002.  Tr. 30.

6.      The claimant's acquired skills are not transferable.

7.      The claimant has the residual functional capacity to perform a significant range of sedentary work.

8.      The claimant is 46 years of age and has a "high school" education.

9.      Although the claimant's exertional and nonexertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.21 as a framework for decisionmaking, there are a significant number of jobs in the national economy that he could perform.  Examples include the sedentary unskilled jobs of sorter and inspector, with over 419,000 such jobs in the national economy.

10.     The claimant was not under a "disability," as defined in the Social Security Act and regulations, at any time through the date of this decision.

On March 26, 2004, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner.  Plaintiff filed this action on May 21, 2004.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972).  Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## DISCUSSION

Plaintiff alleges that the ALJ failed to: (1) properly consider all of the evidence; (2) consider the combined effect of all of his impairments; (3) properly evaluate his credibility; and (4) explain his refusal to accept the opinions of the State agency physicians.

### A.     Substantial Evidence

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence because the ALJ failed "to adequately describe the medical evidence submitted in a manner that demonstrates the ALJ appreciated the Plaintiff's condition and was aware of the diagnoses that were part of the record." Plaintiff's Brief at 12. In particular, Plaintiff claims that the ALJ failed to properly evaluate his upper extremity and cardiac impairments. The Commissioner argues that substantial evidence supports the ALJ's decision that Plaintiff had the physical residual functional capacity ("RFC") for a range of sedentary work.

Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence".

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

The ALJ's decision that Plaintiff had the physical RFC for a range of sedentary work is supported by substantial evidence in the medical and non-medical record. Plaintiff had hip replacement surgery in 1995. Tr. 204. He, however, was able to return to his medium work as

4

a truck driver after his surgery.  Plaintiff was treated by Dr. Thomas Gross, an orthopaedist, on

two occasions.  Tr. 202-206.  On March 4, 1999, Plaintiff reported to Dr. Gross that he had done

well since his hip replacement.  He denied any current problems or pain with his hip and stated

he could walk as far as he wanted and was able to play basketball.  Dr. Gross noted Plaintiff had

full strength and range of motion of his legs, normal reflexes, and equal leg lengths.  Dr. Gross

opined that Plaintiff was doing quite well, but advised against heavy activities such as playing

basketball. Tr. 204.  On October 10, 2000, Dr. Gross treated Plaintiff for a mild right groin

strain.  X-rays of Plaintiff's hip showed good alignment and excellent fixation of both implants

in the bone.  Dr. Gross noted that Plaintiff was walking well with only mild soreness in his groin.

He opined that Plaintiff should use Vioxx as needed and return in approximately two to three years

for a routine check and an x-ray.  Tr. 203.

The ALJ's determination that Plaintiff could perform a wide range of sedentary work

despite his severe cardiac impairment is also supported by substantial evidence.  Plaintiff was also

treated for his cardiac impairment by Dr. Richard Edelson and other cardiologists at the South

Carolina Heart Center from July 1998 to July 2003.  Tr. 145-157, 265-304, 324-358, and

368-369.  He was also treated by Dr. Theodore Frank, a cardiologist, from August 1998 to

October 2001.  Tr. 208-256.  On July 16, 1998, Dr. Edelson examined Plaintiff for complaints

of episodic spells of dizziness and near syncope.  Dr. Edelson noted that Plaintiff was diagnosed

with hypertrophic cardiomyopathy[2] fourteen years previously.  Dr. Edelson diagnosed

hypertrophic cardiomyopathy and paroxymal atrial fibrillation with a rapid ventricular rate,

---

[2]Hypertrophic cardiomyopathy is a noninflammatory disease of the heart muscle, marked by ventricular hypertrophy with diastolic dysfunction manifested as impaired ventricular filling. Dorland's Illustrated Medical Dictionary 296 (30th ed. 2003).

concurrent with symptoms of near syncope. Tr. 154. Plaintiff was hospitalized from August 14

to 17, 1998 for electrophysiologic evaluation and defibrillator placement. See Tr. 216-219. On

August 25, 1998, Plaintiff reported remarkable improvement in his condition following

implantation of a cardioverter defibrillator. Tr. 150. Dr. Edelson noted on October 8, 1998, that

Plaintiff was doing very well, his exercise tolerance was good, he was able to do chores around

the house, and had recently gone on a cruise. Plaintiff reported some minor depression for which

Dr. Edelson prescribed medication. Tr. 148-149. On October 8, 1999, Plaintiff reported to Dr.

Frank that he was doing very well, had been working at a variety of odd jobs, and walked one

mile a day without any shortness of breath. Tr. 214. Dr. Frank opined that Plaintiff was doing

very well and was essentially asymptomatic. Tr. 215. In a letter dated February 22, 2000, Dr.

Frank wrote that Plaintiff was doing well with regard to his defibrillator, but he did not feel

comfortable releasing Plaintiff to work as a commercial truck driver. Tr. 213. In a letter dated

October 13, 2000, Dr. Frank wrote that Plaintiff's most recent echocardiogram revealed marked

improvement with regard to peak left ventricular outflow tract gradient and that Plaintiff continued

to do well. Tr. 210. On December 6, 2000, Dr. Edelson noted that Plaintiff had no further

episodes of syncope and only occasional irregular heart beats. Tr. 279.

Dr. John Beard of the South Carolina Heart Center examined Plaintiff on August 7, 2001.

He wrote that Plaintiff had been doing well until recently, when he started feeling fatigued and

short of breath. Monitoring of Plaintiff's defibrillator showed he was in atrial fibrillation. Dr.

Beard recommended that Plaintiff start on anticoagulation therapy and undergo direct cardioversion

(restoration of the normal rhythm of the heart by electrical shock). Tr. 278. On September 13,

2001, Plaintiff was noted to have atrial fibrillation with intermittent demand ventricular pacing

6

causing progressive shortness of breath with minimal activity. Tr. 275. Plaintiff was admitted to the hospital to undergo echocardiogram and cardioversion. Tr. 276.

On October 22, 2001, Dr. Frank wrote that Plaintiff had a regular cardiac rate and rhythm with no murmurs, gallops, or rubs. An echocardiogram showed an ejection fraction of fifty-five percent and only mild mitral valve regurgitation. Dr. Frank noted that Plaintiff reported getting out of breath with minimal activity, but otherwise seemed to be doing reasonably well. Dr. Frank referred Plaintiff for exercise capacity testing and myocardial oxygen consumption testing. Tr. 209.

On November 19, 2001, Plaintiff reported to Dr. Edelson that he had experienced an episode of paroxysmal atrial fibrillation with intermittent palpitations over the weekend with severe fatigue and dyspnea during the episodes. Dr. Edelson concluded that Plaintiff was stable on his medical regimen. Tr. 272. On February 8, 2002, Plaintiff reported to Dr. Leon Khoury of the South Carolina Heart Center that he had gone into atrial fibrillation the previous night. Dr. Khoury diagnosed atrial fibrillation. Tr. 269. A CT scan was negative for a pulmonary embolism. Tr. 271. On March 25, 2002, Dr. Edelson noted that Plaintiff had been doing great over the past several months. Although Plaintiff complained of exertional chest pain, he denied dizziness or palpitations. Dr. Edelson recommended that Plaintiff continue with his current medications and follow-up in a year. Tr. 265.

On October 18, 2002, Plaintiff reported to Dr. Venk Gottipaty of the South Carolina Heart Center that he was doing "reasonably well" with no substantial symptoms of light headedness, dizziness, presyncope, shortness of breath, or peripheral edema. Plaintiff stated that he had been feeling well until he had a day of fatigue, weakness, and palpitations. He did well after receiving

7

two shocks from his defibrillator.  Dr. Gottipaty noted that Plaintiff had regular cardiac rate and rhythm with a soft systolic ejection murmur.  Interrogation of the defibrillator revealed Plaintiff had atrial fibrillation with a rapid ventricular rate which had triggered his defibrillator to deliver two shocks which resulted in conversion of atrial fibrillation to normal sinus rhythm.  Dr. Gottipaty stated that optimal management of Plaintiff's condition had been difficult and recommended possible medication management.  Tr. 340.  On November 20, 2002, Dr. Gottipaty noted that Plaintiff was doing well and had not had any recurrence of atrial arrhythmia and advised Plaintiff to increase his exercise as tolerated.  Tr. 338.

On December 6, 2002, Plaintiff complained to Dr. Edelson of increasing weakness, fatigue, and exertional dyspnea.  Dr. Edelson changed Plaintiff's medications and scheduled him for cardiac catheterization.  Tr. 337.  On December 27, 2002, Plaintiff told Dr. Edelson that he was still having occasional episodes of near-syncope.  Dr. Edelson noted that Plaintiff had mildly reduced left ventricular systolic function and had stopped taking Verapamil, which resulted in excellent improvement of Plaintiff's overall exercise capacity and a decrease of fatigue.  On January 14, 2003, Plaintiff reported he was feeling much better and his activity tolerance had increased.  Tr. 333.  On January 16, 2003, Dr. Edelson noted Plaintiff had been doing very well over the previous few weeks with no chest pain, shortness of breath, or dyspnea on exertion.  Tr. 331.  Plaintiff experienced a defibrillator shock and was admitted to Providence Hospital on February 25, 2003.  He was monitored and treated with medication.  Plaintiff's condition stabilized and he was released from the hospital on March 6, 2003.  Tr. 391-416.  On March 28, 2003, a stress echocardiogram showed that Plaintiff had normal exercise tolerance.  Tr. 324.

Plaintiff was treated by Dr. Henry Marion of Lexington Family Practice from October 18, 2000 to January 25, 2002 and from April 24, 2003 to July 6, 2003. Tr. 257-263; 388-390. On October 18, 2000, Plaintiff was treated for bronchitis, seasonal allergic rhinitis, and right hip pain. Tr. 259. A complete physical examination was performed on August 15, 2001. Id. Plaintiff complained of a rash on his arm on January 25, 2002. Tr. 258. Dr. Marion performed a complete physical examination on April 24, 2003, at which time he noted Plaintiff had crepitus in his shoulder region and decreased right elbow extension and flexion, but his grip was intact. Dr. Marion noted that Plaintiff's cardiac condition was stable. He encouraged Plaintiff to exercise as much as his cardiac status allowed. Plaintiff was treated for an upper respiratory infection on May 16, 2003. Tr. 390.

Plaintiff was treated in the Providence Hospital emergency room on April 10, 2003 for a left side facial weakness and droop. He was diagnosed with Bell's Palsy and treated with prescriptive therapy. Tr. 360-369. On April 24, 2003, Dr. Marion noted that Plaintiff had a mild left facial droop. Tr. 390. At the hearing before the ALJ, Plaintiff testified that his Bell's Palsy had resolved after approximately six weeks. Tr. 33.

On July 2, 2003, Dr. Edelson stated that Plaintiff had cardiomyopathy and ventricular tachycardia and opined that Plaintiff was totally and permanently disabled and unable to engage in any substantial gainful activity. Tr. 368. On July 6, 2003, Dr. Marion stated that Plaintiff had severe degenerative joint disease, previous cervical fusion surgery, right elbow surgery with a subsequent frozen joint, and right hip replacement surgery. Dr. Marion opined that Plaintiff had a significant decrease in his mobility and limitations of activities of daily living because of his condition. Tr. 388. The ALJ discounted these opinions of disability because they were legal

9

conclusions reserved to the Commissioner; Dr. Edelson's opinion of disability was inconsistent

with the overall evidence of the record, including Dr. Edelson's own reported clinical and

laboratory findings; there was persuasive contradictory evidence demonstrating Plaintiff retained

the RFC to perform the exertional and nonexertional demands of sedentary work despite his

impairments; and Dr. Marion only treated Plaintiff four times in two years and those office visits

were not due to any significant exacerbation of symptoms.[3]  An ALJ is not bound by a conclusory

opinion of disability or entitlement to benefits, even when rendered by a treating physician, since

the issue of disability is the ultimate issue in a Social Security case and that issue is reserved for

the Commissioner.  See 20 C.F.R. § 404.1527(e)(1); Castellano v. Secretary of Health & Human

Servs., 26 F.3d 1027 (10th Cir. 1994); see also Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th

Cir. 2002)(statements that a claimant could not be gainfully employed are not medical opinions,

but opinions on the application of the statute, a task assigned solely to the discretion of the

---

[3]Plaintiff, in his brief, has not challenged the ALJ's decision to discount these treating physician's opinions.  Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1988), and Foster v. Heckler, 780 F.2d 1125, 1130 (4th Cir. 1986).  In those cases, the court emphasized the importance of giving great weight to the findings of the plaintiff's treating physician.  See also Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).  The court in Mitchell also explained that a treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  An ALJ, therefore, must explain his reasons for disregarding a positive opinion of a treating physician that a claimant is disabled.  DeLoatche v. Heckler, 715 F.2d 148 (4th Cir. 1983).

The Commissioner is authorized to give controlling weight to the treating source's opinion if it is not inconsistent with substantial evidence in the case record and it is well supported by clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1527(d)(2).  The Court in Craig found by negative implication that if the physician's opinion "is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig, 76 F.3d at 589.

Commissioner); <u>King v. Heckler</u>, 742 F.2d 968 (6th Cir. 1984); <u>Montijo v. Secretary of Health & Human Servs.</u>, 729 F.2d 599, 601 (9th Cir.1984).

Plaintiff alleges that the ALJ failed to properly evaluate his upper extremity impairments. The ALJ's determination that Plaintiff's upper extremity impairments were not severe impairments is supported by substantial evidence.  Plaintiff was involved in a motor vehicle accident in August 1996, which resulted in a cervical disc rupture at C4-5.  Tr. 373.  On September 16, 1996, Plaintiff underwent cervical fusion of C4-5.  Tr. 385.  Dr. Richard Brower, an orthopaedist, noted Plaintiff's arm pain was gone and his strength was improving on October 29, 1996.  Dr. Brower referred Plaintiff for physical therapy.  Tr. 371.  Plaintiff appears to argue that his impairment was severe because his physical therapist wrote on December 23, 1996 that Plaintiff "still has demonstrated weakness in the upper extremity which has increased one level since he started therapy!!" Tr. 376.  This appears to be a typographical error, however, as the physical therapist also noted that Plaintiff's condition was improving.  <u>Id.</u>  Further, on December 24, 1996, Dr. Brower stated that Plaintiff was doing "quite well" and his strength continued to improve.  Dr. Brower noted the fusion appeared to be solidifying and recommended that Plaintiff continue therapy for a couple of weeks before returning to work.  On August 28, 1997, Plaintiff reported that he was doing "pretty well."  Dr. Brower noted that Plaintiff's x-rays revealed that his fusion was "rock solid" and opined that Plaintiff could return on an as-needed basis.  Tr. 371.  Plaintiff's physical therapist noted in November 1996 that Plaintiff had an open reduction/internal fixation of his right elbow many years prior to that time as a result of a motor vehicle accident, but that his condition was stable.  Tr. 374.  There are no medical records concerning this surgery. Plaintiff was able to return to his medium work as a truck driver after both of these surgeries.

11

There is no indication of any treatment or complaints concerning these impairments until Plaintiff reported to Dr. Marion in April 2003 that he had some problems with his right upper extremity secondary to his right elbow surgery. Dr. Marion noted a decreased range of motion of Plaintiff right elbow and crepitus in his right shoulder, but Plaintiff's grip was intact, there were no neurological deficits associated with Plaintiff's upper extremities, and there were no findings with regard to Plaintiff's left upper extremity. No medication or treatment was prescribed. Tr. 390. Plaintiff's non-attorney representative stated at the hearing that there was no medical evidence substantiating Plaintiff's assertion he essentially had no use of his left arm and a nerve conduction study in 1996 and a 1997 report were "essentially negative." Tr. 41.

The ALJ's decision is also supported by the opinion of the State agency physicians who reviewed Plaintiff's medical records and completed RFC assessments which showed a capacity for a wide range of sedentary work. 20 C.F.R. §§ 404.1527(f)(2) and 416.927(f)(2); SSR 96-6p ("Findings of fact made by State agency … [physicians ]… regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."). On April 3, 2002, Dr. Charles C. Jones opined that Plaintiff maintained the ability to perform sedentary work with lifting and carrying ten pounds occasionally and less than ten pounds frequently; no climbing ladders, rope, or scaffolds; occasional climbing of stairs and ramps; occasional balancing, stooping, kneeling, crouching, and crawling; and avoidance of concentrated exposure to extreme heat, cold, and humidity. Tr. 316-323. On July 31, 2002, Dr. Robert D. Kukla determined that Plaintiff maintained the ability to perform sedentary work with lifting and carrying ten pounds occasionally and less than ten pounds frequently; no climbing ladders, ropes, or scaffolds; occasional climbing

12

of stairs and ramps; occasional balancing stooping, kneeling, crouching, and crawling; and avoidance of concentrated exposure to extreme heat and cold. Tr. 307-314.[4]

B.    Combination of Impairments

Plaintiff alleges that the ALJ failed to properly consider the combined effect of his impairments. The Commissioner argues that the ALJ properly considered Plaintiff's combination of impairments by discussing each of the individual impairments and found that his impairment or combination of impairments did not meet or equal one of the listing of impairments.

In evaluating a claim for disability insurance benefits, the Commissioner is required to consider the combined effects of a claimant's impairments, and he must adequately explain his evaluation of the combined effect of those impairments. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989); Hines v. Bowen, 872 F.2d 56 (4th Cir. 1989); Reichenbach v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985). These factors are mandated by Congress' requirement that the Commissioner consider the combined effect of an individual's impairments, 42 U.S.C. § 423(d)(2)(c), and the general requirement by the courts that an ALJ explicitly indicate the weight given to all relevant evidence. Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987); see also Hines, 872 F.2d at 59.

The ALJ properly considered Plaintiff's combination of impairments. He specifically discussed Plaintiff's cardiac, cervical spine, hip, and upper extremity impairments in the

---

[4]Plaintiff alleges that the ALJ erred in failing to explain his refusal to accept the opinions of the State agency physicians. As noted above, these physicians indicated that Plaintiff could lift a maximum of ten pounds, and could occasionally lift up to ten pounds. The ALJ found that Plaintiff could not lift or carry over ten pounds. Tr. 22. Any discrepancy is harmless, as the jobs identified by the VE (and accepted by the ALJ) are sedentary (see Tr. 52-53) which conforms to the restrictions outlined by the State agency physicians. Sedentary work is defined as work that involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a) and 416.967(a).

13

"Evaluation of the Evidence" section of his decision (Tr. 14-17).  See Browning v. Sullivan, 958

F.2d 817, 821 (8th Cir. 1992)(ALJ sufficiently considered impairments in combination where he

separately discussed each impairment, the complaints of pain and daily activities, and made a

finding that claimant's impairments did not prevent the performance of past relevant work).  The

ALJ also considered Plaintiff's limitations from his combination of impairments in his hypothetical

to the VE.  Specifically, the ALJ asked the VE to consider an individual of Plaintiff's age,

education, and past job experience who was limited to performing work with restrictions that

required a low-stress, supervised environment meaning the individual would have few decisions;

no interaction with the public or team-type interaction with coworkers; no lifting or carrying over

ten pounds; no standing or walking over two hours in an eight-hour day; limited stooping,

twisting, crouching, kneeling, or climbing of stairs or ramps; no crawling or climbing of ladders

or scaffolds; and an environment free from extremes of humidity and temperature.  Tr. 51-52.

In response, the VE testified that he did not have a job which would take into account any job

skills that were transferable from Plaintiff's prior work, but that there were unskilled sedentary

jobs that such a claimant could perform including sorter and inspector.  Tr. 52.

          C.     Credibility

          Plaintiff alleges that the ALJ erred in failing to properly evaluate his credibility,

especially in light of the medical evidence.  The Commissioner argues that the ALJ properly

evaluated Plaintiff's subjective complaints based on the medical and non-medical evidence.

          In assessing credibility and complaints of pain, the ALJ must (1) determine whether there

is objective evidence of an impairment which could reasonably be expected to produce the pain

alleged by a plaintiff and, if such evidence exists, (2) consider a plaintiff's subjective complaints

of pain, along with all of the evidence in the record. See Craig v. Chater, 76 F.3d 585, 591-92 (4th Cir. 1996); Mickles v. Shalala, 29 F.3d 918 (4th Cir. 1994). Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which the impairment can reasonably be expected to cause the pain the claimant alleges he suffers. A claimant's symptoms, including pain, are considered to diminish his or her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

The ALJ properly considered the medical and non-medical evidence in making his credibility determination. The ALJ's decision is supported by the medical record, as discussed above. His physicians advised him to increase his physical activity. Other than his hospitalization from February 25 to March 2003, Plaintiff has not required frequent emergency room treatment or hospitalization for his cardiac impairment. Plaintiff continued working until February 2003. Tr. 329. Work a claimant performs may show he was able to do work at a substantial gainful activity, even if it did not constitute substantial gainful activity. See Zenker v. Bowen, 872 F.2d 268, 270 (8th Cir. 1989); 20 C.F.R. § 404.1571. Plaintiff only took over-the-counter medication (Tylenol) for pain (Tr. 142-143). See, e.g., Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (expressing approval of ALJ's consideration of a plaintiff's lack of strong pain medication); see also 20 C.F.R. §§ 404.1529(c)(3)(listing "other evidence" to be considered when "determining the extent to which [claimant's] symptoms limit [claimant's] capacity for work," including, "(iv)

15

The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms[.]").

CONCLUSION

Despite Plaintiff's claims, he fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence, Richardson v. Perales, supra.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision, Blalock v. Richardson, supra.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  Shively v. Heckler, supra.  It is, therefore,

RECOMMENDED that the Commissioner's decision be affirmed.

Respectfully submitted,

s/Joseph R.  McCrorey
United States Magistrate Judge

August 15, 2005
Columbia, South Carolina

16