IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Richard Miller, ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 3:04-1635-23BC |
| v. ) | |
| ) | **ORDER** |
| Jo Anne Barnhart, Commissioner ) | |
| of Social Security Administration, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("Commissioner") final decision, which denied Richard A. Miller's ("Miller") claim for Disability Insurance Benefits ("DIB"). The record includes a Report and Recommendation ("R&R") of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(a), recommending that the Commissioner's final decision be affirmed. Plaintiff timely objected to the Magistrate Judge's recommendation. *See* 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R&R within ten days after being served with a copy).

## BACKGROUND

### I.   Procedural History

Miller was born on August 19, 1957, and he applied for DIB on September 28, 2001, alleging disability commencing on April 1, 2001. His application was denied initially and upon reconsideration, and he filed a timely request for a hearing, which was held on July 8, 2003, in Columbia, South Carolina. At the hearing, Miller testified and amended his alleged disability onset date to December 21, 2002. The administrative law judge ("ALJ"), after hearing the testimony of

Miller and a vocational expert ("VE"), issued a decision dated November 12, 2003, denying benefits and finding that Miller was not disabled because he retained the residual functional capacity ("RFC") to perform a range of sedentary work that existed in significant numbers in the economy. At the time of the ALJ's decision, Miller was a 46 year-old man with a twelfth-grade education and past relevant work experience as a customer service representative in a call center, a telemarketer, a truck driver, an insurance sales representative, an exterminator, and a sales manager. On March 26, 2004, the Appeals Council denied Miller's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on May 21, 2004.

## II.     Medical Evidence

Miller alleges disability since December 21, 2002, due to limited use of his left arm from a herniated disc, limitation of motion of his right elbow, cardiomyopathy, and total right hip replacement.

### A.     Upper Extremity Impairments

In August of 1996, Miller was involved in a motor vehicle accident which resulted in a cervical disc rupture at C4-5. (Tr. 373.) On September 16, 1996, he underwent an anterior cervical discectomy fusion with iliac crest bone graft. (Tr. 385.) Treatment notes following the surgery from Richard S. Brower, M.D., report that Miller's arm pain was gone and his strength was improving. (Tr. 371.) During the initial evaluation for physical therapy on November 11, 1996, Miller reported that he had undergone open reduction/internal fixation of the right elbow several years earlier and that his right elbow was currently stable and he wished to return to work. (Tr. 374.) On December 23, 1996, Miller was discharged from physical therapy, and in treatment notes from December 24, Dr. Brower stated that Miller "is doing quite well and his strength is improved." (Tr. 371, 376.) Dr.

Brower recommended continuing therapy for a couple of weeks until Miller returned to work. (Tr. 371.) On August 28, 1997, Miller returned to Dr. Brower, who reported: "Rich is doing pretty well and he still has some local symptoms. I think we're safe seeing him back on an as needed basis, as his x-ray appears rock solid." (Tr. 371.)

Miller received continuous medical care from Henry Marion, M.D., of Lexington Family Practice since 1999. On October 18, 2000, Dr. Marion treated Miller for bronchitis, seasonal allergic rhinitis, and right hip pain. (Tr. 259.) On August 15, 2001, Dr. Marion performed a complete physical examination and noted that the overall examination was stable. (Tr. 259.) Dr. Marion advised Miller to continue with his cardiology management. (Tr. 259.) On January 25, 2002, Miller returned to Dr. Marion complaining of a reddish area on his left forearm and possible depression. Dr. Marion diagnosed nonspecific dermatitis and dysthmia. (Tr. 258.) On April 10, 2003, Miller was treated at Providence Hospital for a left side facial weakness and droop, and he was diagnosed with Bell's Palsy and treated with prescriptive therapy.[1] (Tr. 360-69.) Additionally, Dr. Marion conducted a complete physical examination on April 24, 2003, at which time he noted that Miller had crepitus in his shoulder region and decreased right elbow extension and flexion, but that his grip was intact. (Tr. 390.) Dr. Marion treated Miller for an upper respiratory infection on May 16, 2003. (Tr. 390.) On July 6, 2003, Dr. Marion stated that in addition to his heart disease, Miller had degenerative joint disease, previous cervical fusion surgery, right elbow surgery with a subsequent frozen joint, and right hip replacement surgery. (Tr. 388.) Also, Dr. Marion stated, "Limitations in his activities of daily living have developed from his chronic conditions." (Tr. 388.)

---

[1] At the hearing before the ALJ, Miller testified that his Bell's Palsy had resolved after approximately six weeks. (Tr. 33.)

3

**B.     Cardiomyopathy**

On July 16, 1998, Miller visited cardiologist Richard A. Edelson, M.D., with a one-month history of episodic spells of dizziness and near syncope occurring approximately once a week. (Tr. 153.) Dr. Edelson noted that Miller was diagnosed with hypertropic cardiomyopathy 14 years earlier. (Tr. 153.) Aside from the dizzy spells, Miller denied any chest pain, shortness of breath, dyspnea on exertion, or orthopnea. (Tr. 153.) Additionally, Miller claimed that his exercise tolerance was as good as it had ever been and that he played basketball without any complications of his cardiomyopathy. (Tr. 153.) Dr. Edelson diagnosed Miller with the following: hypertrophic cardiomyopathy and paroxysmal atrial fibrillation with rapid ventricular rate, concurrent with symptoms of near syncope. (Tr. 154.)

On August 25, 1998, Miller returned to Dr. Edelson and reported "remarkable improvement" following implantation of a defibrillator. (Tr. 150.) Additionally, treatment notes from Theodore A. Frank, M.D., from October 8, 1998, report that Miller was doing very well on his current regimen, but that he was possibly suffering from depression. (Tr. 148.) Miller returned to Dr. Edelson on January 19, 1999, and reported that he was doing very well with no further episodes of syncope, near syncope, or dyspnea on exertion. (Tr. 147.) On July 9, 1999, Miller again reported that he was doing very well without limitations in his daily activities, although he was concerned about his ability to return to work as a truck driver. (Tr. 146.) In a letter dated February 22, 2000, Dr. Frank wrote that although Miller was able to drive his own personal vehicle, he did not feel comfortable releasing Miller to work as a commercial truck driver. (Tr. 213.) On October 6, 2000, Miller told Dr. Frank that he had changed jobs and that he had occasional shortness of breath but felt "great." (Tr. 211.) In another letter dated October 13, 2000, Dr. Frank noted a marked

improvement in left ventricular outflow tract gradient and stated that Miller "continues to do well." (Tr. 210.) Treatment notes from Dr. Edelson, dated December 6, 2000, state that Miller had "been doing fantastically over the past several months, having experienced no further episodes of syncope." (Tr. 279.)

On August 7, 2001, Miller visited John T. Beard, M.D., with a recent onset of atrial fibrillation and shortness of breath. (Tr. 278.) Dr. Beard asked Miller to begin anticoagulation therapy and recommended direct cardioversion, or restoration of the normal rhythm of the heart by electrical shock, if all went well. (Tr. 278.) On September 13, 2001, Miller visited the South Carolina Heart Center with complaints of shortness of breath. (Tr. 275.) Miller was admitted to the hospital to undergo an echocardiogram and cardioversion. (Tr. 276.) On November 19, 2001, Miller returned to Dr. Edelson after an episode of atrial fibrillation with intermittent palpitations and with complaints of severe fatigue and dyspnea. (Tr. 272.) At this visit, Miller was in his standard AV sequential paced rhythm and reportedly felt fine with no complications. (Tr. 272.)

On February 8, 2002, Miller visited Leon J. Khoury, M.D., after going into atrial fibrillation the previous night. (Tr. 269.) Miller told Dr. Khoury that he was not having any unusual discomfort or shortness of breath but that he did get fatigued easily. (Tr. 269.) On March 25, 2002, Miller returned to Dr. Edelson for an office visit; Dr. Edelson's notes state: "Mr. Miller has been doing great over the past several months. . . . He does note stable exertional chest pain, dyspnea, no dizziness, no significant palpitations." (Tr. 265.) Dr. Edelson recommended that Miller continue on his current medical regimen and follow up with him in one year. (Tr. 265.)

Thereafter, on October 18, 2002, Miller reported to Venk Gottipaty, M.D., after having a day of fatigue, weakness, and palpitations. (Tr. 339.) Miller reported that he had been doing reasonably

well before this, and Dr. Gottipaty administered two defibrillator shocks, following which Miller "did well." (Tr. 339.) Dr. Gottipaty stated that "[o]ptimal management in Mr. Miller is difficult at best," but that "[t]here are numerous options available." (Tr. 339.) Miller returned to Dr. Gottipaty on November 20, 2002, and reported that he was doing well and had not had any symptoms of dizziness or lightheadedness although he had experienced some shortness of breath with exercise. (Tr. 338.) Dr. Gottipaty asked Miller to increase his exercise regimen as tolerated and planned on seeing him again in four months. (Tr. 338.)

On December 6, 2002, Miller returned to Dr. Edelson with complaints of increasing weakness, fatigue, and exertional dyspnea. (Tr. 337.) Dr. Edelson altered Miller's medication and scheduled him for cardiac catheterization. (Tr. 337.) Miller returned to Dr. Edelson on December 27, 2002, and reported that he was still having occasional episodes of near-syncope. (Tr. 335.) Dr. Edelson noted that Miller now had mildly reduced left ventricular systolic function and discontinued Miller's Verapamil, which resulted in excellent improvement in Miller's overall exercise capacity and a decrease in his easy fatiguability. (Tr. 335.)

Miller returned to Dr. Gottipaty on January 14, 2003, and reported that he was feeling better although he still had some exertional shortness of breath. (Tr. 333.) Two days later, Miller visited Dr. Edelson for a routine office visit, and Dr. Edelson noted that Miller was doing very well and recommended some alteration in Miller's medication. (Tr. 331.)

On February 25, 2003, Miller experienced a defibrillator shock while sitting at his computer. (Tr. 328.) Nurse Practitioner Linda Adams sent Plaintiff to be admitted to Providence Hospital. (Tr. 329.) On March 26, 2003, Dr. Edelson noted that Plaintiff had been hospitalized from February 25, 2003, until March 6, 2003, due to his defibrillator firing and continued problems with tachycardia.

(Tr. 326.) At this time, Miller reported frequent palpitations and occasional lightheadedness. (Tr. 326.) Dr. Edelson felt that Miller's change in symptoms were related to drastic changes in Miller's medication, and he recommended a stress echocardiogram. (Tr. 327.) The stress echocardiogram showed normal exercise tolerance. (Tr. 324.)

### C.     Right Hip Replacement

Plaintiff Miller visited orthopaedist Thomas P. Gross, M.D., on March 4, 1999, for a routine evaluation of his right hip replacement. (Tr. 204.) According to Dr. Gross's notes, Miller was not having problems with his right hip, and he was walking as far as he wanted to and was even playing some basketball. (Tr. 204.) Dr. Gross noted that Miller was doing quite well, but he recommended that Miller not participate in such heavy activities as playing basketball. (Tr. 204.)

Plaintiff returned to Dr. Gross on October 10, 2000, suffering from groin pain without any injury. (Tr. 203.) Miller had taken Aleve, and Dr. Gross reassured him about his hip replacement and recommended that he take Vioxx as needed and return for a routine check-up and x-ray in approximately two or three years. (Tr. 203.)

### D.     Residual Functional Capacity ("RFC") Assessments

On April 3, 2002, Charles C. Jones, M.D., a state agency physician, performed the first of two physical RFC assessments, based on a review of Miller's medical records. Robert D. Kukla, M.D., performed the second assessment on July 31, 2002. Both doctors on both occasions found that Miller maintained the ability to perform sedentary work with the following exertional limitations: occasionally lifting and/or carrying ten pounds; frequently lifting and/or carrying less than ten pounds; standing and/or walking (with normal breaks) for a total of at least two hours in an eight-hour workday; sitting (with normal breaks) for a total of at least six hours in a normal

7

workday; pushing and/or pulling unlimited other than shown for lifting and/or carrying; no climbing ladders, ropes, or scaffolds; occasional climbing stairs and ramps; occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to extreme heat, cold, and humidity. (Tr. , 305-23.)

## DISCUSSION

### I.    Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 269 (1976). The Court reviews *de novo* those portions of the R&R to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The court has reviewed the entire record, the R&R, and Plaintiff's objections. The court adopts the R&R by specific reference and incorporates it to the extent that it is not inconsistent with this Order.

### II.   Standard of Review

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

8

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## III.   Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability. The Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). This determination involves the following five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

*Mastro*, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the

next step. *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993). The burden of production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that a claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. *Walls*, 296 F.3d at 290.

Applying this framework, the ALJ found: (1) that Miller had not engaged in substantial gainful activity since the alleged onset date of disability; (2) that Miller had the "severe" impairments of cardiomyopathy with ventricular tachycardia and residuals of total hip replacement; and (3) that although these impairments were severe, they did not meet or equal a listed impairment. At the fourth step, the ALJ considered Miller's RFC and found that he was capable of performing sedentary work requiring simple, routine work in a low-stress, supervised environment and that included the following: no interaction with the public or team-type interaction with co-workers; no lifting or carrying of over 10 pounds; no standing and/or walking over two hours in an eight-hour day; limited stooping, twisting, crouching, kneeling, and climbing of stairs or ramps; no crawling or climbing of ladders or scaffolds; and an environment free from extremes of humidity and temperatures. (Tr. 19- 20.) Following from this RFC, the ALJ found that Miller was unable to perform his past relevant work experience as an inbound call center operator, a telemarketer, an insurance sales representative, an exterminator, and a sales manager. (Tr. 20.) At the fifth step of the analysis, however, the ALJ accepted the testimony of the VE that a person of Plaintiff's age, with his educational background, work experience, and RFC, could perform work as a sorter or an

inspector.[2] (Tr. 21.) Therefore, the ALJ found that Miller was not disabled. (Tr. 22.) Upon a review of the record, the Magistrate Judge recommended that this court affirm the ALJ's decision.

## ANALYSIS

Miller raises three main objections to the R&R. Miller contends that the Magistrate Judge: (1) failed to explain why the ALJ's findings regarding Miller's heart condition were supported by substantial evidence; (2) failed to explain why the ALJ's findings regarding Miller's upper extremity impairments were supported by substantial evidence; and (3) incorrectly substituted *de novo* rationalization to support the ALJ's credibility findings.

### I.    Miller's Heart Condition

The ALJ determined that Miller's heart condition was a severe impairment; however, the ALJ did not find that this condition precluded the limited range of work as set forth in the ALJ's RFC findings. (Tr. 14, 19-20.) Miller contends that the ALJ made errors and/or omissions in reviewing the relevant medical evidence and therefore, the ALJ did not consider the combined effect of all of Miller's impairments. In his objections, Miller states:

> The bottom line is that the ALJ's description of the Plaintiff's cardiac impairment . . . simply does not match the medical evidence. And in lieu of a better explanation than is provided by the ALJ or the Magistrate, the ALJ's findings are not supported by substantial evidence because the hearing decision seems to suggest the ALJ was simply not aware of what much of the medical evidence indicated.

(Pl. Obj. 4.) The court disagrees and finds that the ALJ did properly consider the medical evidence and that the ALJ's findings are supported by substantial evidence.

---

[2] The VE responded to the ALJ's hypothetical: "Yes, Your Honor. One is a sorter which is unskilled and sedentary. . . . There's 400 based on government figures in the State of South Carolina, and 64,000 in the nation. Another job would be that of inspector. . . . There's 2,100 in South Carolina, and 355,000 in the nation." (Tr. 52.)

11

First of all, both the ALJ and the Magistrate Judge expended great effort to adequately summarize Miller's medical history. (Tr. 14-19; R&R 4-10.) And as previously mentioned, the ALJ found Miller's cardiomyopathy with ventricular tachycardia and residuals of total right hip replacement to be severe impairments. (Tr. 14.) Furthermore, after making a comprehensive evaluation of the medical evidence, the ALJ found that although Miller's cardiac impairments had "some limitations on his ability to work, the evidence fails to substantiate that his impairments, either singly or in combination, are of the severity as to preclude the performance of *all* work-related activities."[3] (Tr. 18.) (emphasis added). Additionally, the Magistrate Judge noted that the ALJ discounted Dr. Edelson's opinion of disability because it consisted of a legal conclusion reserved to the Commissioner and that "there was persuasive contradictory evidence demonstrating Plaintiff retained the RFC to perform the exertional and nonexertional demands of sedentary work despite

---

[3] The ALJ made several references to the medical evidence in making this conclusion, including the following:

> Statements made by the claimant and his physicians regarding his condition do not support a finding that the claimant is totally disabled due to any impairment. Dr. Marion stated in August 2001 that the claimant had considerable improvement with dyspnea since pacemaker stabilization, and that he was stable overall. In October 2002, Dr. Gottipaty stated the claimant was doing reasonably well; and in November 2002, Dr. Gottipaty encouraged the claimant to increase his exercise. In December 2002, Dr. Edelson stated the claimant had excellent improvement of his overall exercise capacity and decrease of fatiguability; and in January 2003, he reported the claimant was doing very well. Also in February 2003, Dr. Edelson stated the claimant was stable and had no obstruction. In December 2002, the claimant reported no dyspnea or orthopnea; in January 2003, the claimant had no complaints of shortness of breath, dizziness, dyspnea on exertion, syncope, or pre-syncope; and in March 2003, the claimant stated he had only occasional lightheadedness and had chest discomfort after walking up stairs which quickly resolved with rest.

(Tr. 18.)

his impairments."[4]  (R&R 10.)  In light of the preceding, the court finds no reversible error in the ALJ's treatment of the evidence regarding Miller's heart condition and concludes that substantial evidence supports the ALJ's determination.

## II.     Miller's Upper Extremity Impairments

Miller also objects that "the ALJ dismissed his upper extremity problems with statements in the hearing decision that are simply not supported by the medical evidence."  (Pl. Obj. 4.)  Miller claims that the Magistrate Judge failed to explain why the ALJ's findings were supported by substantial evidence.  Again, the court disagrees with Plaintiff and finds no reversible error in the ALJ's evaluation of Miller's upper extremity impairments.

First, as previously mentioned, both the ALJ and the Magistrate Judge expended great effort to adequately summarize Miller's medical history.  (Tr. 14-19; R&R 4-10.)  Also, in the hearing, when Miller stated that he cannot do anything that requires working on the computer because he cannot support his arm and has very little use of his shoulder, the ALJ asked Miller whether he had any medical evidence substantiating that claim.  (Tr. 41.)  The ALJ asked, "I'm sure there must be some medical evidence of atrophy of the limb, nerve conduction study, electromyelograms?"  (Tr. 41.)  Miller's counsel responded, "No, Your Honor.  There is a nerve conduction study in the '96 and '97 report that shows essentially negative."  (Tr. 41.)  Additionally, when the ALJ asked Miller whether he had used his left arm or hand in other jobs since the surgery, Miller responded, "When

---

[4] In a letter dated July 2, 2003, Dr. Edelson stated, "It is my opinion that Mr. Miller is totally and permanently disabled. . . . [H]e is unable to engage in any substantial gainful activity. . . . for a continuous period of not less than twelve months."  (Tr. 368.)  The Magistrate Judge correctly noted, "An ALJ is not bound by a conclusory opinion of disability or entitlement to benefits, even when rendered by a treating physician, since the issue of disability is the ultimate issue in a Social Security case and that issue is reserved for the Commissioner."  (R&R 10.) (citations omitted).

I can I do, yes."[5]  (Tr. 42.)  Ultimately, the Magistrate Judge correctly noted that the ALJ's determination that Plaintiff's upper extremity impairments were not severe impairments is supported by substantial evidence.[6]  (R&R 11.)  Accordingly, Miller's objection is without merit.

---

[5] Moreover, the ALJ reported in his findings:

> The evidence shows that claimant returned to work as a truck driver after his neck surgery, which indicates he had no significant limitations as a result of that surgery. . . . The medical evidence fails to show that these alleged impairments are of the severity as to impose more than a minimal effect on his ability to perform work-related activities and are, therefore, considered 'nonsevere,' as defined in the regulations.

(Tr. 14.)

[6] The Magistrate Judge stated:

> Plaintiff appears to argue that his impairment was severe because his physical therapist wrote on December 23, 1996 that Plaintiff "still has demonstrated weakness in the upper extremity which has increased one level since he started therapy!!" This appears to be a typographical error, however, as the physical therapist also noted that Plaintiff's condition was improving.  Further, on December 24, 1996, Dr. Brower stated that Plaintiff was doing "quite well" and his strength continued to improve. . . . Dr. Brower noted that Plaintiff's x-rays revealed that his fusion was "rock solid" and opined that Plaintiff could return to work on an as-needed basis.  Plaintiff's physical therapist noted in November 1996 that Plaintiff had an open reduction/internal fixation of his right elbow many years prior to that time as a result of a motor vehicle accident, but that his condition was stable.  There are no medical records concerning this surgery.  Plaintiff was able to return to his medium work as a truck driver after both of these surgeries.  There is no indication of any treatment or complaints concerning these impairments with Plaintiff until Plaintiff reported to Dr. Marion in April 2003 that he had some problems with his right upper extremity secondary to his right elbow surgery.  Dr. Marion noted a decreased range of motion of Plaintiff['s] right elbow and crepitus in his right shoulder, but Plaintiff's grip was intact, there were no neurological deficits associated with Plaintiff's upper extremities, and there were no findings with regard to Plaintiff's left upper extremity.  No medication or treatment was prescribed.  Plaintiff's non-attorney representative stated at the hearing that there was no medical evidence substantiating Plaintiff's assertion he essentially had no use of his left arm and a nerve conduction study in 1996 and a 1997 report were "essentially negative."

### III.    Miller's Credibility

Lastly, Miller alleges that the ALJ failed to properly evaluate his credibility, especially in light of the medical evidence. Plaintiff claims "that because the ALJ cited the lack of supporting medical evidence as a primary reason for dismissing Plaintiff's credibility, the credibility determination is necessarily flawed insomuch as it is shown the ALJ did not acknowledge or consider much of the medical evidence." (Pl. Obj. 7.) Essentially, Miller argues that the ALJ did not review or weigh all of the medical evidence, and therefore, the credibility determination is necessarily flawed. However, as the court addressed at length in response to Miller's first two objections, the record reveals that the ALJ did review and weigh the medical and non-medical evidence in making his credibility determination[7] (Tr. 14-22; R&R 4-10.), and therefore, the court again finds Plaintiff's objection without merit.

---

(Tr. 11-12.)

[7] In Finding 3, the ALJ states, "The claimant has medical impairments that could reasonably cause some of his subjective symptoms; however, the evidence does not substantiate his allegations concerning the level of severity of physical limitations, pain, or functional restrictions. Therefore, such allegations are less than fully credible." (Tr. 22.) In support of his conclusion, the ALJ noted:

> In this case, the evidence reflects the claimant's cardiac impairment is effectively maintained on his current medical regimen. His cardiac impairment required hospitalization from February 25, 2003, through March 6, 2003, but has not required frequent emergency room treatment nor frequent inpatient hospitalization. The records reflect the claimant's cardiac impairment has not required cardiac rehabilitation, and that his right hip impairment has not required emergency room treatment, inpatient hospitalization, physical therapy, or significant medication for pain or symptoms."

(Tr. 19.)

## **CONCLUSION**

The court has reviewed the entire record, including all of the evidence highlighted by Miller, and finds no reversible error in the ALJ's treatment of the evidence. Viewing the record as a whole, there is no indication that the ALJ improperly considered or failed to explain the weight given to any of the medical or non-medical evidence that Miller now relies upon. Furthermore, resolving conflicts in the evidence is squarely within the province of the ALJ, and it is not for this court to reweigh the evidence or substitute its judgment for that of the ALJ. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). For the reasons stated by the Magistrate Judge and in this Order, this court concludes that substantial evidence supports the ALJ's decision.

It is, therefore, **ORDERED**, for the foregoing reasons that the Commissioner's denial of benefits is **AFFIRMED**.

**AND IT IS SO ORDERED**.

*[Signature]*
PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**September 16, 2005**